Linda NOBLE, Plaintiff

v.

DOLGENCORP, INC., Defendant.

Civil Action No. 5:09CV49–LG–RHW.

United States District Court,
S.D. Mississippi,
Western Division.

May 11, 2010.

Roman Ashley Shaul, Beasley, Allen, Crow, Methvin, Portis & Miles, P.C., Montgomery, AL, for Plaintiff.

Joel S. Allen, Ronald E. Manthey, Morgan, Lewis & Bockius, LLP, Dallas, TX, Herbert C. Ehrhardt, Ogletree, Deakins, Nash, Smoak & Stewart, PC, Ridgeland, MS, for Defendant.

*MEMORANDUM OPINION AND ORDER GRANTING THE DEFENDANT'S MOTION FOR SUMMARY JUDGMENT*

LOUIS GUIROLA, JR., District Judge.

**BEFORE THE COURT** are the Motion for Summary Judgment [20] and the Motion to Strike [35] filed by the defendant, Dolgencorp, Inc. (hereinafter "Dollar General"). Dollar General argues that there is no genuine issue of material fact that the plaintiff, Linda Noble, qualified for the executive exemption to the overtime requirement imposed by the Fair Labor Standards Act (FLSA). It also requests that the Court strike certain exhibits presented by Noble in opposition to its Motion for Summary Judgment. After a thorough review of the submissions of both parties and the applicable law, the Court finds that Dollar General is entitled to judgment as a matter of law and that this lawsuit should be dismissed with prejudice. The Court further finds that the Motion to Strike is moot because none of Noble's exhibits present a genuine issue of material fact.

INTRODUCTION

Noble and numerous other Dollar General store managers have sued the company, alleging that they were denied overtime compensation in violation of the FLSA. The store managers argue that they were improperly treated as exempt employees pursuant to the executive exemption of the FLSA. These managers argue that the majority of the work they performed in their stores was non-managerial manual labor, such as stocking shelves and running cash registers, due to insufficient labor budgets provided by Dollar General. They particularly emphasize that "truck day," which is the day on which stock was delivered to the store, required the average Dollar General employee to walk three to eight miles and carry three to four tons of merchandise. They also argue that they had little discretion in running their stores due to detailed corporate policies and supervision from district managers.

Dollar General has requested a stay of the other Dollar General FLSA cases assigned to this Court until this Court has issued a ruling on the present Motion for Summary Judgment concerning Noble's claims. The plaintiffs in the other cases assigned to this Court are also in favor of a stay, but on the grounds that they have filed a motion to reopen the multidistrict litigation proceedings, *In re: Dollar General Corp. Fair Labor Standards Act Litigation,* MDL No. 1635. Since a stay has not been requested by either party in Noble's case, the Court will address Dollar General's Motion for Summary Judgment.

### FACTS

Noble was first hired by Dollar General on April 11, 2000, and was trained as a certified store manager. (Noble Deposition, Ex. R to Def.'s Mot. at 68–69, 75–76, 79). She worked as the store manager for the Dollar General Store on Highway 61 in Vicksburg, Mississippi. (*Id.* at 69, 76). She was initially paid approximately $425 per week, and she understood that this was a flat rate, regardless of the number of hours she worked. (*Id.* at 70–71). On January 11, 2001, she was robbed and beaten while making a night deposit for the store and was unable to work for approximately three months. (*Id.* at 197, 200). When she returned to work, she was on light duty and could not lift more than five pounds. (*Id.* at 200). On April 13, 2001, she received a raise to $440 a week. (*Id.* at 157). She also received another raise the following year to either $453 or $463 per week. (*Id.*) She continued to work as store manager until she voluntary resigned her employment with Dollar General on June 12, 2002. (*Id.* at 80). She was eligible for bonuses throughout her employment but never received one. (*Id.* at 164).

The job description of the store manager provided by Dollar General provides that the store manager reports to the district or area manager. (Ex. H to Def.'s Mot.) The store manager supervises the assistant store manager and store clerks. (*Id.*) The general summary of the position provides that the duties of the store manager are to "manage inventory efficiently and effectively present merchandise," to "manage store employees," and to "ensure a safe working environment while providing for the protection of company assets." (*Id.*) The duties and essential job functions for this position include recruiting and selecting qualified employees, training employees, supervising employees, ordering merchandise pursuant to company procedures and policies, facilitating efficient staging and storing of merchandise, maintaining accurate inventory levels, ensuring the store's financial integrity, providing superior customer support leadership, and completing paperwork and documentation. (*Id.*)

At a deposition taken by counsel for Dollar General, Noble described her employment and job duties as store manager. She testified that the major problems she experienced in managing the store were a severe rodent problem that destroyed merchandise and a lack of sufficient employees to help keep the store stocked. (Noble Deposition, Ex. R to Def.'s Mot. at 49). She was given a labor budget, and if she exceeded that budget one week, she would be given a lower budget the following week to make up for the extra hours. (*Id.* at 232). This inevitably meant that she would have to work extra hours the next week. (*Id.*)

She explained that Dollar General provided her with a plan, which was called a "plan-o-gram," that showed where the merchandise should be displayed on the shelves and how the store should be organized. (*Id.* at 47). She did not have the right to change that plan. (*Id.*) However,

she had extra space that was not covered by the plan-o-gram, and she decided what to do with that space. (*Id.* at 111–12, 189–90).

There were five to ten employees on the payroll for her store at all times that she served as store manager. (*Id.* at 162–63). She assigned tasks to her employees and told them what to do every day. (*Id.* at 50–51). She decided which employees did which tasks in running the store, and even decided which tasks she would perform. (*Id.* at 128). She trained all of her employees, which took approximately three weeks for each employee. (*Id.* at 110–11). She trained the employees how to run the cash registers, how to stock shelves, and how to "recover" the store after customers disturbed the shelves and merchandise. (*Id.* at 122–25). She also trained her staff on how to look for shoplifters, and she was constantly watching for shoplifting while performing other tasks like running the cash register and stocking shelves. (*Id.* at 65–67). In addition, she was constantly monitoring her employees, regardless of what other tasks she was performing. (*Id.* at 68). For example, she would watch her cashiers and evaluate their performance while she was working in the store's beauty section. (*Id.* at 106).

Noble admitted that she was in charge of the store. (*Id.* at 51). It was her responsibility to make sure that the employees followed the employee handbook, and she tried to enforce it. (*Id.* at 81–82). She was the person in the best position to ensure that store policies were being followed. (*Id.* at 82). She was the highest ranking person in the store on any given day. (*Id.* at 83). She was expected to enforce the company's OSHA policy, drug testing policy, and anti-discrimination and harassment policies, and she reviewed these policies with each new employee. (*Id.* at 83–84). Noble disciplined the em-

ployees without input from the district manager and was expected to evaluate each employee's performance. (*Id.* at 95, 97, 120). She was responsible for generating written performance reviews concerning each employee. (*Id.* at 97; Ex. 61 to Noble's deposition). These evaluations were based on her personal observation of employees in the store. (Noble Deposition, Ex. R to Def.'s Mot. at 98). Employees could get a pay raise or a promotion based on her evaluations, and Noble was permitted to recommend employees for raises. (*Id.* at 98, 137). Noble agreed that she served as the "eyes of the company" with respect to the performance of lower level employees and that she, not the district manager, was in the best position to judge their performance for the Company. (*Id.* at 99).

Noble chose to get input on running the store from subordinate employees because she believed that helped foster teamwork. (*Id.* at 99–100). It was ultimately her responsibility to ensure that the store was clean. (*Id.* at 100). She agreed that she considered it to be her store, and she was accountable for the store's performance. (*Id.* at 104, 105). She "patrolled" the floors, looking for messes and anything unsafe. (*Id.* at 106). She held safety meetings with her employees and decided to also let the employees discuss any concerns or problems they had concerning their jobs at these meetings. (*Id.* at 114–15). She was not told to expand the subject matter of these meetings but chose to do so on her own. (*Id.* at 117). Dollar General did not give her a script for these meetings. (*Id.*)

Noble chose to hire temporary workers to unload the delivery trucks that brought merchandise to the store. (*Id.* at 112). These employees did not work the cash register and only unloaded the truck. (*Id.*) Noble was in charge on these "truck

days." (*Id.* at 125). She delegated and directed the tasks performed by the employees during those deliveries. (*Id.*) She also received and inspected the truck. (*Id.* at 125–26). There is no evidence before the Court concerning whether Noble actually helped unload the merchandise or merely supervised the other employees as they did so.

Although Noble was permitted to hire employees, she was not permitted to fire anyone. (*Id.* at 95, 108). She did, however, make recommendations that certain employees be fired, and those recommendations were always followed. (*Id.* at 237). There was one occasion where an employee was fired, but she did not want the employee to be fired. Noble witnessed this employee being tricked out of $100 while running the register and reported the employee's mistake to Dollar General, but she liked the employee and did not want her to be fired. (*Id.* at 106–07, 138–39).

Noble also interviewed prospective employees. (*Id.* at 147). She chose to use a booklet she received from a former employer to conduct the interviews and modified it to make it her own. (*Id.* at 146). Other tasks performed by Noble as manager included signing personnel action forms that notified the company of employee status changes, signing employment eligibility verifications, filling out progressive counseling forms concerning employee discipline, scheduling employees, handling deposits, going through store mail, analyzing cash register reports, and handling all new hire paperwork. (*Id.* at 120–21, 131, 147–48, 150, 193, 223–24). In summary, she specifically agreed that she managed the store every day by supervising, coaching, and counseling employees. (*Id.* at 243).

Noble was supervised by a district manager who was also assigned to about twenty-five other stores. (*Id.* at 87–88). The district manager did not have an office in her store. (*Id.* at 51). The initial district manager was in the store about once a week or once every other week. (*Id.* at 87). Sometimes he would spend an entire day in the store, and sometimes he would make a quick run-through. (*Id.* at 87). In March of 2001, a new district manager was assigned to her store. (*Id.* at 87). He only spent about two hours in the store each month. (*Id.* at 89). This district manager did not provide her with a lot of guidance. (*Id.*) The initial district manager was reassigned to the store in April of 2002 until the end of her employment. (*Id.* at 90).

Noble's store had one assistant manager, who received the same training she did. (*Id.* at 75–76). Noble testified that she hired the assistant manager, and she was the assistant manager's boss. (*Id.* at 85–86, 94). She gave the assistant manager performance reviews, delegated managerial tasks to her, including the handling of certain customer complaints, and relied on her to do certain things in Noble's absence. (*Id.* at 94, 237–38). The assistant manager ran the store while Noble was recovering from injuries suffered when she was robbed. (*Id.* at 95). Noble permitted the assistant manager to interview employees and make recommendations regarding hiring, but only Noble was permitted to hire employees. (*Id.* at 95). The assistant manager also was not permitted to discipline other employees. (*Id.*) The assistant manager, who worked forty hours each week, was originally paid about $7 an hour, but she eventually received a raise to about $8 an hour. (*Id.* at 166). Thus, the assistant manager was paid a maximum of $320 a week. (*Id.*)

Noble did not keep a diary or journal that would reflect the number of hours she worked in the store each week. (*Id.* at 25–26). The store schedules that she drafted

each week would not accurately reflect how many hours she worked each week, because she would schedule herself for very few hours as a joke. (*Id.* at 25–27). Her estimates regarding the amount of hours she worked and the percentages of time she spent on different types of work are somewhat contradictory. She testified that she worked approximately 50 to 60 hours on average each week at the store. (*Id.* at 60). At one time prior to her deposition, she signed an undated declaration that she worked over seventy hours a week at the store. (*Id.* at 250; Ex. 71 to Noble's Deposition). However, when confronted with this at her deposition, she admitted that it was probably more like 60 hours a week. (Noble Deposition, Ex. R to Def.'s Mot. at 250). She also explained that when she says she worked an average of 60 hours a week, she was not counting all of the work that she did at the store. (*Id.* at 262–63). The most hours she worked in a week was 80. (*Id.* at 261). She claims that she spent about thirty hours a week on paperwork. (*Id.* at 223–24, 251). After she was robbed she spent approximately 65% of her time stocking shelves and the remaining thirty-five percent of her work was non-manual labor. (*Id.* at 202). At the close of her deposition, she testified that she did manual work at the store fifty to sixty percent of the time. (*Id.* at 265).

### DISCUSSION

Any party to a civil action may move for summary judgment upon a claim, counter-claim, or cross-claim as to which there is no genuine issue of material fact and upon which the moving party is entitled to prevail as a matter of law. FED.R.CIV.P. 56. A party seeking summary judgment bears the initial burden of identifying those por-

tions of the pleadings and discovery on file, together with any affidavits, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the movant carries its burden, the burden shifts to the non-movant to show that summary judgment should not be granted. *Celotex Corp.,* 477 U.S. at 324–25, 106 S.Ct. 2548. The non-moving party may not rest upon mere allegations or denials in its pleadings but must set forth specific facts showing the existence of a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256–57, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The FLSA requires employers to pay overtime to employees who work more than forty hours per week. 29 U.S.C. § 207(a)(2). However, employees working in a "bona fide executive, administrative, or professional capacity" as defined by regulations promulgated by the Secretary of Labor are exempt from the FLSA overtime requirements. 29 U.S.C. § 213(a)(1). Exemptions from the FLSA are to be construed narrowly against the employer. *Blackmon v. Brookshire Grocery Co.,* 835 F.2d 1135, 1137 (5th Cir.1988).

If the employee at issue earns $250 per week or more, a "short test" is used to determine whether the employee is exempt under the executive exemption. *Dalheim v. KDFW–TV,* 918 F.2d 1220, 1224–25 (5th Cir.1990); 29 C.F.R. § 541.1(f)(2000).[1] The requirements of the short test are: (1) "the employee was compensated on a salary basis at a rate of not less than $250 per week;" (2) the employee customarily or regularly supervised the work of two or more employees; and (3) the employee's

---

1. New regulations governing exempt employee status went into effect on August 23, 2004. Since Noble was employed by Dollar General between April 11, 2000, and June 12, 2002, the Court will apply the regulations that were in effect at that time.

primary duty consisted of "the management of the enterprise in which the employee [was] employed or of a customarily recognized department or subdivision thereof." 29 C.F.R. § 541.1(f) (2000). The determination as to the employee's primary duty must be based on all of the facts applicable to the employee's case. 29 C.F.R. § 541.103 (2000). The regulations provide:

> The amount of time spent in the performance of the managerial duties is a useful guide in determining whether management is the primary duty of an employee. In the ordinary case it may be taken as a good rule of thumb that primary duty means the major part, or over 50 percent, of the employer's time. Thus, an employee who spends over 50 percent of his time in management would have management as his primary duty.

29 C.F.R. § 541.103 (2000). Nevertheless, employees who spend less than fifty percent of their time performing managerial work may still have management as their primary duty "if other pertinent factors support such a conclusion." *Id.* These factors are: (1) the relative importance of the managerial duties as compared with other types of duties; (2) the frequency with which the employee exercises discretionary powers; (3) the employee's relative freedom from supervision; and (4) the relationship between the employee's salary and the wages paid other employees for the kind of nonexempt work performed by the supervisor. *Id.* The regulations provide that the following tasks are considered exempt work when performed by an employee in the management of her department or the supervision of her employees:

> interviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; direct-

ing their work; maintaining their production or sales records for use in supervision or control; appraising their productivity and efficiency for the purpose of recommending promotions or other changes in their status; handling their complaints and grievances and disciplining them when necessary; planning the work; determining the techniques to be used; apportioning the work among workers; determining the type of materials, supplies, machinery or tools to be used or merchandise to be bought, stocked and sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety of the men and the property.

29 C.F.R. § 541.102. The Fifth Circuit has held that the "essence of the test is to determine the employee's chief or principal duty." *Dalheim,* 918 F.2d at 1227; *Lovelady v. Allsup's Convenience Stores, Inc.,* No. 08–10662, 304 Fed.Appx. 301, 305 (5th Cir.2008). "[A]n employee's 'primary duty' cannot be ascertained by applying a simple 'clock' standard that contrasts the amount of time each day an employee spends on exempt and nonexempt work." *Dalheim,* 918 F.2d at 1227.

In *Lovelady,* the Fifth Circuit held that the lower court did not err in granting summary judgment to an employer based on the executive exemption where the store managers at issue had "authority to make hiring and firing recommendations, [and] their job duties included training employees, dealing with vendors, disciplining employees, creating work schedules, handling employee grievances, ordering inventory for their stores, ensuring compliance with [the employer's] policies and procedures, ensuring the accuracy of employee time records, controlling and minimizing expenses, and recommending promotions of clerks to assistant managers," even though the store managers performed some of the same tasks as non-

exempt store clerks. *Lovelady*, 304 Fed. Appx. at 305. The Fifth Circuit agreed that, under those circumstances, management was the store managers' primary duty. *Id.*[2]

In the present case, it is undisputed that Noble earned more than $250 a week and supervised two or more employees. Therefore, the only issue before the Court is whether the evidence tends to demonstrate that Noble's primary duty consisted of management of the store. Dollar General first relies on Noble's testimony that she worked an average of fifty to sixty hours per week, that she spent thirty hours a week on paperwork, and that fifty to sixty percent of her time was spent on manual work, claiming that this testimony demonstrates that Noble spent over fifty percent of her time performing managerial tasks. Specifically, Dollar General argues that if Noble worked sixty hours in one week and spent thirty of those hours on paperwork alone, she must have spent more than fifty percent of her time performing paperwork and other managerial tasks. Although the regulations provide that this "clock standard" is a "good rule of thumb" for determining an employee's primary duty, this Court will not rely solely on the way in which Noble divided her time due to the Fifth Circuit's rejection of the "clock standard" in *Dalheim*, particularly since Noble's time estimations do not concretely show that she spent more than half of her time on managerial work throughout her employment. *See Dalheim*, 918 F.2d at 1227; 29 C.F.R. § 541.103 (2000).

Nevertheless, even if Noble did not spend more than half of her time doing managerial work, she can still be designated as exempt under the FLSA if the fac-

tors set forth at 29 C.F.R. § 541.103 (2000) are satisfied. Noble's own deposition testimony, which is described in detail above, clearly demonstrates that her primary duty was management of the store. Aside from the three months when Noble was unable to work due to injuries, Noble was at all times supervising her employees, managing and protecting her inventory, and directing the way in which the store was operated. She constantly exercised discretion over the discipline imposed on her employees, the job assignments provided to each and every employee in the store, the hours worked by each employee, and the manner in which she handled employees' and customers' problems and complaints. She received over $100 more per week than her assistant manager, and she received very limited supervision and direction from her district managers. In fact, the district managers were present in the store one day each week at most, according to her testimony. The Court is aware that Noble stocked shelves, cleaned the store, and ran the cash register when needed, but the duties that were most important to Dollar General were her managerial duties, particularly the supervision and training of her employees and the protection of inventory.

Noble argues that her assistant manager and some clerks performed managerial tasks in the store. However, Noble testified that she chose to delegate those managerial tasks to her subordinate employees. Thus, even her decision to delegate managerial tasks was managerial in nature. In addition, her arguments regarding the number of miles an average employees walks on truck day and the number of tons carried do not demonstrate that her primary duty was not management. (*See* Ex.

---

**2.** This Court recognizes that the *Lovelady* decision pertained to the newer version of the regulations, but the Court in *Lovelady* primar-

ily relied on *Dalheim,* which involved the previous version of the regulations. *See id.*

C to Pl.'s Resp.) First, she testified that she directed her employees on truck day, and thus, any work performed by Noble was her own decision. Second, she testified that she hired four men specifically for the purpose of unloading the truck, and her regular employees did not unload the truck. Third, the statistics relied on by Noble discuss only the "average employee" rather than the average store manager.

Noble also points out that she testified that she spent sixty-five percent of her time stocking shelves even after she was injured. As the Court explained previously, the Court will not rely solely on Noble's estimations of time spent performing certain tasks. Furthermore, it should be pointed out that Noble testified that she was always supervising both her customers and her employees while she was performing manual work. Although she chose to stock shelves, she did not abdicate her managerial duties while performing that task.

Noble also argues that Dollar General has labeled the manager's paperwork as "unnecessary." (Ex. B to Pl.'s Resp.) The only type of paperwork described as "unnecessary" are "reporting requirements," such as "transaction logs." Noble testified that she filled out a lot of paperwork, much of which pertained to the hiring, evaluation, and disciplining of employees. The Court is unsure what types of documents are "reporting requirements" or "transaction logs," but this appears to cover only a small portion of the paperwork performed by store managers. In addition, the fact that some paperwork completed by Noble may have later been deemed "unnecessary" does not tend to show that she was not performing managerial duties.

Noble also submits evidence that store managers frequently commented that they needed larger labor budgets in order to properly stock the shelves in a survey completed after Noble resigned her position. Noble expressed similar concerns in her deposition. Although the labor budgets may have caused the store managers to work longer hours and may have required them to spend more time stocking shelves, the allegedly small budgets do not alter Noble's primary duty to manage the store.

Furthermore, Noble argues that she was closely supervised by the district manager. For example, she notes that the district manager chose whether employees were terminated or received raises and left her about one voice message each day. However, Noble overlooks her admission that the decisions regarding termination and raises were usually based on her own recommendations. She agreed that the district manager was not in the store enough to make these decisions without her assistance. There is no indication that the district manager told her how to supervise or discipline her employees.

Noble also relies on her testimony that she had to receive permission from Dollar General before speaking with the store's landlord about problems. She further notes that she was required to report cash shortages of five dollars or more to the district manager. She also claims that the district manager once hired temporary employees for the store, ordered her to clean out the stockroom, and would let her know what items could be temporarily removed from shelves to make room for other merchandise. These arguments merely demonstrate that the district manager gave her directions on the handling of merchandise and store problems on a few occasions.

Finally, Noble submits portions of Dollar General's Standard Operating Procedures in an attempt to demonstrate that everything she did in the store was dictated by Dollar General and she had little or no discretion. (Ex. FL to Pl.'s Resp.)

These procedures include instructions for answering the phone while on the cash register, handling exchanges, cleaning restrooms, telephone courtesy, handling emergencies, and handling angry customers. As the Court has previously explained, Noble had considerable discretion regarding the supervision and management of her employees. The fact that the company had procedures that it wished for its employees to follow does not tend to show that Noble had no authority to manage her store. In fact, at her deposition Noble agreed that she used the standard operating procedures as a resource, but she did not study them every day in order to make decisions about how to run her store. (Noble Deposition, Ex. R to Def.'s Mot. at 207–08).

Upon reviewing the pleadings and exhibits submitted by the parties, the Court finds that Noble's primary duty was to manage the Vicksburg Dollar General Store. As a result, she was properly exempted from the overtime requirements of the FLSA. In the opinion of the Court there is no genuine issue as to any material fact and Dollar General is therefore entitled to judgment as a matter of law. The Court further finds that Dollar General's Motion to Strike Noble's exhibits is moot, since the Court has determined that those exhibits do not create a genuine issue as to any material fact.

**IT IS THEREFORE ORDERED AND ADJUDGED** that the Motion for Summary Judgment [20] filed by Dolgencorp, Inc., is **GRANTED.** This lawsuit is hereby **DISMISSED WITH PREJUDICE.**

**IT IS FURTHER ORDERED AND ADJUDGED** that the Motion to Strike [35] filed by the defendant, Dolgencorp, Inc., is **MOOT.**